Carlson et al. *v.* A. & P. Corrugated Box Corporation, Appellant.

Argued January 11, 1950. Before MAXEY, C. J., DREW, LINN, STERN, STEARNE and JONES, JJ.

*S. Dale Furst, Jr.,* with him *Harry Alvan Baird* and *Furst, McCormick, Muir & Lynn,* for appellant.

*Marvin D. Power,* with him *Michael J. Maggio* and *Margiotti & Casey,* for appellees.

OPINION BY MR. JUSTICE HORACE STERN, March 20, 1950:

This appeal is based upon two contentions:—(1) that defendant's negligence did not cause any damage to plaintiff that would not have occurred even if such negligence had not existed and therefore it was not a proximate cause of plaintiff's injury; (2) that, even if defendant's negligence did cause damage to plaintiff that would not otherwise have occurred, defendant

should be held liable only for such part of the damage as was caused by defendant's negligence alone.

The facts are these:—Plaintiff was a resident of the Borough of Austin in Potter County, where he owned a building on Main Street in which he conducted a store for the sale of hardware. Defendant is a corporation engaged in the manufacture of paper and paper products, and in connection with its operating plant it maintained a timber crib dam across the North Branch of Freeman's Run about 1½ miles north of Austin and at an elevation of about 188 feet above the level of the Main Street bridge over the North Branch. This dam was approximately 580 feet in length; its slope, facing downstream, measured 32 feet; it was 22 feet in height; it had been built in 1910 and enlarged in 1920 to raise the normal flow line of the reservoir about two feet by covering the dam with an earth fill; it had an opening or spillway at the center formed of heavy planks, and it impounded about 65 million gallons of water at the spillway crest. Toward midnight of July 17-18, 1942, a heavy rain started in the watershed of the North Branch and continued more or less sporadically during the entire morning and early afternoon of the following day. At about 11:00 A.M. on July 18 a large part of the spillway came out, the earthen embankment started to wash away, and the impounded water, being thereby released, flowed in a huge wave down the stream, raising the water on Main Street in the Borough to a height of about 8 feet, sweeping into and through many of the buildings, destroying pavements, washing out streets, and carrying houses a distance of from several hundred feet to a quarter of a mile. Plaintiff's store and merchandise were damaged by the flood. He brought action against defendant corporation to recover for its alleged negligence in failing properly to repair and maintain the dam; his suit, together with those of others who had suffered similar

injuries, was transferred, by an order of this court, from Potter to Lycoming County, where it was tried by Hon. DON M. LARRABEE, sitting, by agreement of the parties, without a jury. Findings were made by the learned trial judge in favor of plaintiff and judgment was entered in accordance therewith, from which judgment defendant now appeals. By agreement of counsel all the appeals in the other cases are to be treated as if filed in the present appeal.

From the manner in which the case was tried in the court below it seems to have been assumed that the heavy rainstorm of July 18 was an act of God, but there is grave doubt whether, from a legal standpoint, it should be so considered. An act of God, as defined in the law, is an unusual, extraordinary, sudden, and unexpected manifestation of the forces of nature which cannot be prevented by human care, skill or foresight: 38 Am. Jur. 649, §7; *Martin v. Philadelphia,* 54 Pa. Superior Ct. 563, 567. Was this storm so unusually severe or otherwise extraordinary as to warrant its characterization as an act of God? In determining whether a flood is or is not extraordinary there must be taken into account the character of the particular stream, the adjacent territory, and the history of previous floods: *Brown v. Pine Creek Rwy. Co.,* 183 Pa. 38, 52, 38 A. 401, 403. The evidence here was that the rain was torrential but not in the nature of a cloudburst nor of any unprecedented, overwhelming violence or fury; witnesses testified that it was a flash flood similar to others that had frequently occurred in that part of the country in previous years, a flash flood being defined by them as one that merely brought the stream to the top of its banks, or, if overflowing them, did not cause any serious damage; it was testified also that that locality usually had high water in the spring of the year. However we shall, for purposes of this discussion, treat this heavy rainfall, as did the court below, as an act of God.

Defendant does not seriously contest the charge of negligence in regard to its upkeep of the dam. It appears that the State Department of Forests and Waters, following a number of inspections, concluded in 1941 that the dam was unsafe and would probably fail should a flood occur in Freeman's Run; it was found that the timber crib in the center of the dam had badly decayed during the 30 years in which it had been in place, that thereby the entire dam had been allowed to settle, that there were many leakages, and that the spillway capacity was insufficient for the drainage area. Defendant's officers were informed of the dangerous condition and they agreed that, to make the dam safe, they would breach the spillway to within about four feet of the upstream level. They failed to carry out this agreement and no work of any kind was done on the dam from that time until the disaster occurred; experts called by plaintiff testified that, in their opinion, if the dam had been breached as promised it would not have failed on this occasion. It is clear, therefore, that the court was amply justified in finding, as it did, that defendant was negligent in the construction and maintenance of the dam and that it burst as the result of that negligence.

What defendant contends on this appeal is that the damage which this and the other plaintiffs suffered would have occurred even had the dam not broken,— that the rainfall and consequent rise and overflow of the water in the Run would, by themselves, have caused the damage complained of. It might be a sufficient answer to this assertion to point out that the court below found to the contrary and "It is well settled, by the decisions of this court, that in a case tried by the court, under the Act of 1874, a writ of error only brings up questions of law. This court cannot go behind the findings of fact, as they appear in the record. The judge, in such cases, exercises the double function of court and jury, and we

are to dispose of the case here precisely as if the facts had been found by a jury; . . . The parties, by agreement, designated the tribunal for the determination of these disputed questions of fact, and they cannot now complain if the adjudication is adverse to their interests": *Brown, Early & Co. v. Susquehanna Boom Co.,* 109 Pa. 57, 70, 1 A. 156, 160. If there is evidence to support the findings of the judge, and they are approved, as here they were, by the court en banc, this court will not overrule them or substitute its judgment for that of the trial court: *Meitner v. Scarborough,* 321 Pa. 212, 215, 184 A. 81, 82; *Perletto v. Lancaster Avenue Building & Loan Association,* 353 Pa. 366, 370, 45 A. 2d 10, 13; *Macchia v. Megow,* 355 Pa. 565, 568, 50 A. 2d 314, 315; *Coleman, Administrator, v. Huffman,* 357 Pa. 232, 235, 53 A. 2d 601, 603; *Mindlin v. Freedman,* 165 Pa. Superior Ct. 498, 500, 69 A. 2d 177, 178.

There was evidence which amply supported the court's finding that the high water with its swift and violent current which caused the damage throughout the Borough was all due to the bursting of the dam. It was convincingly shown that the destructive effects of the flood occurred about 11:30 A.M. as the result of a wave of water which suddenly swept from the dam and which was easily distinguished by the witnesses because of its dark muddy color in contrast with the clear blue or green of the water in the stream; this wave, consisting evidently of the 65 million gallons that were added to the water flowing down the Run, was of a height of from four to five feet above the then level of the stream and it spread rapidly over the Borough; its terrific force has already been described. There was testimony that at the time the dam broke the water in the Run, although it had been gradually rising, was still confined to its banks and the rainwater was being carried off fairly well by the gutters and sewers. The flood reached a

crest of some eight feet between 11:40 A.M. and noon; it then subsided and, notwithstanding the continuance of the rain for several hours thereafter, never reached any such height again. Of particular significance is the fact, as the court below found, that at the time the dam burst the level of the impounded water in the reservoir was still from 2 to 2½ feet below the top of the earthen embankment; at no time was the dam overtopped by the flow of the water from upstream.[1] In view of this testimony the court properly found that the amount of rainfall was immaterial, that the high water was all due to the failure of the dam, and that therefore the negligence of defendant which brought about that failure was the proximate cause of the damage.

Were we to assume—which is the most that can be claimed by defendant—that its negligence was not the exclusive cause of the disastrous effects of the flood but merely concurred, as a causative agent, with an act of God, the question arises whether defendant would be legally liable under such circumstances. To that question a unanimous host of authorities, both in our own Commonwealth [2] and elsewhere, present an affirmative

---

[1] Defendant contends that even if the dam had been properly constructed and maintained, or if it had been breached as agreed upon, it would nevertheless have been washed away by overtopping of the earthen embankment. This argument, however, is purely speculative, and it loses all force in view of the court's finding that the dam was *not* overtopped.

[2] *Lehigh Bridge Co. v. Lehigh Coal & Navigation Co.*, 4 Rawle S, 24; *Livezey v. Philadelphia*, 64 Pa. 106, 108, 109; *Baltimore & Ohio R. R. Co. v. Sulphur Spring School District*, 96 Pa. 65, 70; *Elder v. Lykens Valley Coal Co.*, 157 Pa. 490, 498, 499, 27 A. 545, 546; *Helbling v. Allegheny Cemetery Co.*, 201 Pa. 171, 174, 50 A. 970, 971; *Rocap v. Bell Telephone Co.*, 230 Pa. 597, 603, 79 A. 769, 771; *Kindell v. Franklin Sugar Refining Co.*, 286 Pa. 359, 363, 133 A. 566, 568; *Siegfried v. South Bethlehem Borough*, 27 Pa. Superior Ct. 456, 463; *Taylor v. Canton Township*, 30 Pa. Superior Ct. 305, 318, 319; *Rife v. Middle-*

answer, for they uniformly hold that although no liability can be fastened upon the defendant if the damage is caused by an act of God so overwhelming as of its own force to produce the injury independently of the defendant's negligence, such liability does arise if the damage results from the concurrence of the defendant's negligence with the act of God and the damage would not have occurred in the absence of such negligence. As was said in *Rife v. Middletown*, 32 Pa. Superior Ct. 68, 77: "The rule of law is that, although an act of God entails no injury upon anyone in contemplation of law, yet if man contributes towards it, it is man alone that is responsible." This is only an application of the general principle that the fact that some other cause concurs with the negligence of the defendant in producing an injury does not relieve the defendant from liability unless he can show that such other cause would have produced the injury independently of his negligence: 38 Am. Jur. 715, §63.

The remaining question in the case arises from defendant's insistence that it should be held liable at the most for only such part of the total damage caused to this and the other plaintiffs as was due to the bursting of the dam as distinguished from the damage that may have resulted from the rain and consequent flooding of the stream; to this end it produced testimony as to the relative amounts of the impounded water that escaped through the dam and that which accumulated from the rainfall. Of course, in any such calculation there must also be taken into consideration as a factor the period

*town*, 32 Pa. Superior Ct. 68, 76, 77; *Engle v. Luzerne County Gas Co.*, 36 Pa. Superior Ct. 311, 318; *Martin v. Philadelphia*, 54 Pa. Superior Ct. 563, 570, 571; *Harber v. Pennsylvania R. R. Co. (No. 1)*, 56 Pa. Superior Ct. 59, 65; *Laritza v. Pennsylvania Power Co.*, 106 Pa. Superior Ct. 587, 596, 597, 162 A. 333, 336, 337; see Rest., Torts, §§432, 450.

of time during which a given amount of the water was hurled upon the damaged properties, there being obviously a great difference in the effects caused by a sudden, violent impact of a large mass of water as compared with a similar or even much greater mass descending gradually as rainfall over a period of several hours. However, apart from this, there is no logical or reasonable basis for limiting defendant's responsibility by *any* apportionment of the damage. It may, at first blush, seem unjust, as defendant argues, to hold it liable for the entire damage that occurred if it can be proved that of the water which flooded the Borough of Austin only a certain percentage came through defendant's dam and the remaining portion from the rainfall which was an act of God. But, upon further consideration, it becomes quickly manifest that the relative proportions of the amounts of water that combined to create the damage are immaterial in view of the fact that the evidence does not show that the rainfall would have caused *any* damage had the water from the reservoir not combined with it; therefore it is both logical and just that defendant should be held liable for *all* the damage on the theory, borne out by the testimony, that, but for its negligence, *none* of the damage would have been sustained. It is a familiar legal doctrine that where two tortfeasors are guilty of concurrent negligence each is responsible for the full amount of the resulting damage and is not entitled to any apportionment of liability: *Ferne, Administratrix, v. Chadderton,* 363 Pa. 191, 196, 69 A. 2d 104, 107. There is no reason why the same rule should not apply where one of the operative agencies, instead of being a tortfeasor, is a force of nature. Thus it was held in *Inland Power & Light Co. v. Grieger,* 91 F. 2d 811, that the owner of a dam who was negligent in discharging impounded water in time of flood was liable for all the damage caused to a lower riparian landowner by the concurrent action of the flood water and the

water negligently discharged, even though the effect of such discharge was to increase the flow only six per cent; it was stated that where damage is the result of two concurring causes, one of which is the negligence of the defendant and the other the negligence of a third person, the defendant is liable to the same extent as though it had been caused by his negligence alone, and it was held that the same rule must prevail where the concurring causes of the damage are the negligence of the defendant and an act of God. In none of the like cases decided by our own appellate courts[3] did the defendant raise a question as to apportionment of liability for damage nor assert any such right; in all of them it was either held or assumed that a defendant whose negligence *in any degree* caused the loss was liable for all the damage that the plaintiff suffered.

The judgment is affirmed, and the judgments are likewise affirmed in the other appeals which are covered by the agreement of counsel.

---

[3] See footnote 2.